NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KADEANA PAGE<br><br>Plaintiff,<br><br>v.<br><br>PAYLESS SHOESOURCE, INC., "MARIA", AND JOHN DOES ONE THROUGH TEN,<br><br>Defendants. | Civ. Action No. 10-2793 (KSH) (PS)<br><br><br><br><br><br>**OPINION** |

**Katharine S. Hayden, U.S.D.J.**

I. Introduction

Plaintiff Kadeana Page applied for a job at defendant Payless ShoeSource, Inc.'s ("Payless") store on 8th Street in Passaic, New Jersey. The store did not hire her, and she alleges that the store's manager told her that the decision was due to her race. Plaintiff sued for a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., and for common law intentional infliction of emotional distress. Payless filed a motion for summary judgment.

II. Facts and Procedural History

The facts are drawn primarily from the parties' statements of undisputed facts. When a fact is disputed, the Court will refer to the deposition transcripts and other documents that the parties submitted with their briefs.

A. Plaintiff's Education and Employment History

1. Plaintiff's Education

Plaintiff is African-American. (Def.'s Stmt. Material Facts ¶ 1; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 1.) She graduated from Passaic High School in 2002 and attended Farleigh Dickinson University for two semesters in fall 2002 and spring 2003. (Def.'s Stmt. Material Facts ¶¶ 2–3; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶¶ 2–3; Pl. Dep. 15:9–14, appended to Pl.'s Br. Opp. Mot. Summ. J., Ex. A ("Pl. Dep.").) In her deposition, plaintiff explained that she did not return to Fairleigh Dickinson because it became unaffordable, and that she sporadically took classes at Passaic County Community College over the next five years. (*See* Pl. Dep. 15:25–16:2, 16:16–30:16.)

2. Plaintiff's Prior Work Experience

In her deposition, plaintiff states that she baby-sat her cousins in the summer following her high school graduation. (*Id.* 15:3–7.) After she began attending Fairleigh Dickinson, she obtained a part-time work/study job at the front desk of the university's recreation center. (Def.'s Stmt. Material Facts ¶ 4; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 4.) Asked at her deposition to explain her responsibilities there, plaintiff responded:

> I just made sure, you know, they didn't steal anything. I controlled the TV, handed out the pool sticks, like whatever things they wanted. And for front desk, I answered the phones, did a little paperwork. Helped the visitors if they needed to find something on campus, like, where their child was or where the gym was. I direct them.

(Pl. Dep. 41:9–18.)

Plaintiff continued this job until she left Fairleigh Dickinson in 2003. (Def.'s Stmt. Material Facts ¶ 7; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 7.)

Plaintiff's next job came around June 28, 2007, when she began working at Kmart in Lodi, New Jersey. (Def.'s Stmt. Material Facts ¶ 8; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 8.) In her position as a task associate, plaintiff worked across several departments "primarily performing different tasks such as processing and receiving and scanning products in the store room." (Def.'s Stmt. Material Facts ¶ 9; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 9.) Initially, this job provided full-time employment. (Def.'s Stmt. Material Facts ¶ 10; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 10.) Around February 2008, however, Kmart converted plaintiff's position to part-time, providing work for four hours per day, two days per week. (Def.'s Stmt. Material Facts ¶ 11; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 11.) According to plaintiff's deposition testimony, one week she went to check the schedule and saw that she was not listed for the next two weeks; her manager explained that budget cuts were the cause of her absence from the schedule and that she would call when plaintiff was needed again. (Pl. Dep. 35:18–23.) Plaintiff never received a phone call. (*Id.* 35:3–4, 36:10–12.) She returned two weeks later to check the schedule, and upon seeing that she once again was not there, she left and never returned. (*Id.* 35:11–20, 36:23–37:19.) According to a document titled Kmart Separation Report and signed by plaintiff's supervisor, she was terminated on March 1, 2008 due to "job abandonment." (Aversa Cert., Ex. C.)

Plaintiff testified in her deposition that between 2008 and 2011, she applied for approximately 50 to 60 jobs, attaining about five or six interviews but no offers. (Pl. Dep. 46:25–47:24.)

    3. Plaintiff's Application to Payless

Around November 3, 2009, plaintiff submitted an online application for a sales associate position at Payless. (Def.'s Stmt. Material Facts ¶ 55; Pl.'s Resp. to Def.'s Stmt. Material Facts

¶ 55.) Livia Lindsay, the manager of the Payless on 8th Street in Passaic, received the application and contacted plaintiff to schedule an interview.  (Def.'s Stmt. Material Facts ¶¶ 56–60; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶¶ 56–60.)

Plaintiff interviewed with Lindsay at the store for approximately 20 to 30 minutes.  (Def.'s Stmt. Material Facts ¶ 61; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 61.)  Most of the interview consisted of typical questions regarding plaintiff's work history and reasons for applying.  (Def.'s Stmt. Material Facts ¶¶ 64–65; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶¶ 64–65.)  However, several non-routine questions and statements are also alleged to have taken place, and these questions and statements represent the parties' principal disputes of fact.

First, plaintiff testified in her deposition that at the beginning of the interview, Lindsay asked her if she spoke Polish, and plaintiff responded that she did not.  (Pl. Dep. 63:12–20.)  Plaintiff remarked that the job description posted online did not say anything about a requirement to be bilingual, to which Lindsay replied, "No, just asking."  (*Id.* 70:7–14.)  In her deposition, Lindsay explained that she asked this question because plaintiff saw "people in the store speak Polish and Spanish and English," was "kind of impressed how people speak different languages there," and asked whether foreign language proficiency was required, to which Lindsay replied that it was not.  (Lindsay Dep. 52:16–23, appended to Pl.'s Br. Opp. Mot. Summ. J., Ex. E ("Lindsay Dep.").)[1]

---

[1] It must be noted that plaintiff's brief repeatedly misrepresents the record by stating that Lindsay told plaintiff that Polish fluency was a requirement for the job.  (*See* Pl.'s Br. Opp. Mot. Summ. J. 1 ("During plaintiff's job interview Ms. Lindsay . . . stated that in order to be hired at the store, she had to speak Polish."); *id.* at 3 ("[D]efendant offers no justification for Ms. Lindsay's . . . unfounded claim that candidates for positions at the subject Passaic store were required to speak Polish."); *id.* at 18 ("Further circumstantial evidence directly reflecting on a discriminatory attitude includes Ms. Lindsay's . . . false assertion that in order to be hired at the subject store, she needed to speak Polish.").)  The record provides no support for this claim.  At her deposition,

4

Second, plaintiff testified at her deposition that Lindsay asked her if she was Jamaican because her "name sounds Jamaican" and was reminiscent of the name of another "Jamaican girl" with whom Lindsay previously worked. (Pl. Dep. 63:21–64:2, 87:8–20.)

Third, and most significant to this litigation, plaintiff stated in her deposition that after the interview, Lindsay said, "I'm not going to be able to hire you because you're African-American, you know, black," and that plaintiff "should try applying to stores where African-Americans shop because African-Americans don't shop here." (*Id.* 66:9–12, 67:5–8.) When plaintiff protested that African-Americans do shop there, Lindsay responded, "No, you should try the one on Main Ave. Closer to the projects." (*Id.* 67:12–15.) In her deposition, Lindsay denied making these remarks. (Lindsay Dep. 58:2–4, 59:10–20.) Plaintiff testified that before she left, she asked if Lindsay still wanted her to take a urine test. (Pl. Dep. 68:10–11.) Lindsay responded that plaintiff should call her the next day. (*Id.* 68:11–13.) Plaintiff did so, and Lindsay told her that she would call back but never did. (*Id.* 68:11–69:3.)

In her deposition, Lindsay testified that her only reason for not hiring plaintiff is that plaintiff had a "negative attitude" during her interview: "She was very negative in her conversations, very negative how she feel people think about her. Yes. Always was, always she feel at the job nobody like her and I don't think that was something required to work in the company, somebody negative that way." (Lindsay Dep. 51:7–25.) Lindsay entered into the Payless computer system that plaintiff was not hired because of "insufficient skills." (Aversa

---

plaintiff never stated that Lindsay told her of such a requirement. Nor did plaintiff ever state that she was led to believe such a requirement existed. To the contrary, plaintiff testified that when she said she would not have applied if Polish proficiency had been a job requirement, Lindsay responded, "No, just asking." (Pl. Dep. 70:7–14.) Accordingly, for purposes of this motion, the Court rejects plaintiff's assertion that Lindsay told her that Polish language skills were a job requirement.

5

Cert., Ex. M.)  A third party company created the computer program, and the program provides four possible options to select for why a person was not hired: insufficient experience, insufficient skills, has no degree, and not a cultural fit.  (Hilt Dep. 15:17–22, appended to Aversa Cert., Ex. J.)

Plaintiff remained unemployed until October 3, 2011, when she was hired as a "Sales Floor Hardlines" at Target Department Stores.  (Pl.'s Cert., Oct. 13, 2011 (discussing new job); *see also* Def.'s Stmt. Material Facts ¶ 15 (acknowledging unemployment following Kmart termination); Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 15.)

B.  Payless's Hiring Practices

Payless maintains an Equal Employment Opportunity policy.  (*See* Aversa Dep., Ex. F.)  The policy provides that "[a]ll employment decisions are to be made without regard to race, color, creed, religion, national origin, ancestry, ethnicity, age, sex, pregnancy, sexual orientation, disability, marital status, citizenship, veteran's status or any other protected status."  (*Id.*)  Payless also maintains an anti-discrimination policy.  (*See* Aversa Dep., Ex. G.)  Payless's code of conduct for employees prohibits "[v]iolation of the Company's policies against discrimination and harassment."  (Aversa Dep., Ex. H.)

According to Payless records, the Payless at 8th Street in Passaic employed ten self-identified African-Americans between May 1, 2005 and June 1, 2010.  (Def.'s Stmt. Material Facts ¶¶ 35–45; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶¶ 35–45.)  They served in positions including sales associate, assistant store manager, store manager, and senior store manager.  (Def.'s Stmt. Material Facts ¶¶ 36–45; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶¶ 36–45.)  The lengths of these employees' tenures vary.  Eight of these ten employees worked at the store for seven days or less.  (Aversa Cert., Ex. L; *see also* Pl.'s Stmt. Material Facts ¶¶ 68–77; Def.'s

Resp. to Pl.'s Stmt. Material Facts ¶¶ 68–77.)  The other two employees worked at the store for 48 weeks and parts of 56 weeks.  (Aversa Cert., Ex. L; *see also* Pl.'s Stmt. Material Facts ¶¶ 71–72; Def.'s Resp. to Pl.'s Stmt. Material Facts ¶¶ 71–72.)

Lindsay testified in her deposition that two African-Americans worked at the store while she was manager from summer 2009 to summer 2010.  (Lindsay Dep. 24:17–21, 33:12–36:5.)  She could not recall the name of the first, whose time at the store with Lindsay was brief.  (*Id.* 35:4–13.)  The second employee was Kisha Donaldson, who worked as a "shared labor" employee.  (Def.'s Stmt. Material Facts ¶ 46; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 46.)  A "shared labor" employee is an employee assigned to one store but who "may be assigned to a different store to work there on an as needed basis."  (Def.'s Stmt. Material Facts ¶ 47; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 47.)  Donaldson worked at the 8th Street Payless at Lindsay's request for a total of two days.  (Def.'s Stmt. Material Facts ¶ 48–49; Pl.'s Resp. to Def.'s Stmt. Material Facts ¶ 48–49; Pl.'s Stmt. Material Facts ¶ 74; Def.'s Resp. to Pl.'s Stmt. Material Facts ¶ 74.)

   C.   Procedural History

On May 3, 2010, plaintiff filed a complaint in New Jersey Superior Court, Passaic County.  [D.E. 1.]  The complaint set forth two counts: violation of the New Jersey Law Against Discrimination ("LAD") and intentional infliction of emotional distress.  On June 1, 2010, Payless removed the case to federal district court on the basis of diversity jurisdiction.  [D.E. 1.]  On August 18, 2011, Payless filed a motion for summary judgment.  [D.E. 42.]  On July 13, 2011, Chief Judge Brown referred the case to arbitration [D.E. 32], but on August 22, 2011, Magistrate Judge Shwartz stayed that order, with the consent of the parties, pending the Court's determination of the summary judgment motion [D.E. 44].

III. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In determining the existence of a genuine dispute as to a material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247–48 (1986).  Rather, the fact in dispute must be genuine, meaning that a reasonable jury could find the fact in favor of the nonmoving party, and it must be material, meaning that it "might affect the outcome of the suit under the governing law." *Id.* at 248.

Federal Rule of Civil Procedure 56(c)(1) provides that parties in summary judgment motions may support their arguments by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials," or by showing that the other party's proffered materials do not "establish the absence or presence of a genuine dispute." Because the summary judgment inquiry looks to whether the nonmoving party has sufficient facts to prevail at trial, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 447 U.S. at 248 (citations and quotation marks omitted).  To that end, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" and must instead present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting *Fed. R. Civ. P.* 56(e)).  Moreover, "if the factual

8

context renders [the nonmoving party's] claim implausible ― if the claim is one that simply makes no . . . sense ― [the nonmoving party] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.* at 587. Inferences drawn from the facts in the record "must be viewed in the light most favorable to the party opposing the motion." *Id.* (citation and quotation marks omitted).

IV. Discussion and Analysis

Payless presents three arguments: that plaintiff is unable to show that Payless did not hire her because of her race; that plaintiff's intentional infliction of emotional distress claim must be dismissed because it is unsupported and preempted by LAD; and that plaintiff is not entitled to punitive damages.

Initially, the Court notes the factual dispute about why Payless did not hire plaintiff. Plaintiff claims that at her job interview, Lindsay told her that she could not be hired because of her race. Lindsay denies that she ever said this. Given the content of the statement, it would appear that summary judgment is simply unavailable. Notwithstanding, Payless has argued that the Court should disregard plaintiff's assertion as a self-serving allegation, address its various arguments, and make rulings in its favor as a matter of law. Accordingly, the Court must go beyond the observation that the parties disagree about a serious allegation and determine if the statement has significance and materiality that endure beyond defendant's legal arguments. If so, a jury must decide whether it believes plaintiff or Lindsay.

A.  New Jersey Law Against Discrimination

LAD provides that it is unlawful for an employer to refuse to hire a person due to race or national origin. N.J.S.A. 10:5-12(a). To determine the intent behind an allegedly discriminatory hiring decision, the New Jersey Supreme Court has adopted the framework of Title VII of the

Civil Rights Act of 1964. *See Henry v. N.J. Dep't of Human Servs.*, 204 N.J. 320, 330 (2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 208 (1999) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

The parties dispute which standard for proving discriminatory intent applies: *McDonnell Douglas* or *Price Waterhouse*. Plaintiff argues that she can prevail under either theory (Pl.'s Br. Opp. Mot. Summ. J. 16–21), and Payless argues that the *Price Waterhouse* framework is inapplicable because plaintiff does not argue mixed motive but instead asserts that Payless's proffered motive is mere pretext for discrimination. (Def.'s Reply Br. Further Supp. Mot. Summ. J. 6 (citing *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 589 n.7 (D.N.J. 1994) (Pisano, J.) ("In a mixed motives case, the plaintiff concedes that the legitimate motives articulated by an employer played a factor in the adverse employment decision."))). Although Payless accurately describes *Price Waterhouse* as being a "mixed motive" analysis, its applicability is not contingent on a plaintiff's concession that the defendant's legitimate non-discriminatory reason for the decision played a factor. In *McDevitt v. Bill Good Builders, Inc.*, 175 N.J. 519, 527 (2003), the New Jersey Supreme Court held that *Price Waterhouse* is applicable "when a plaintiff produces evidence that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action." *See also Sisler*, 157 N.J. at 208–09 (discussing significance of direct evidence as triggering point for *Price Waterhouse* applicability). Moreover, Justice O'Connor's controlling opinion in *Price Waterhouse* gave three reasons for deviating from *McDonnell Douglas*: (1) an employer is not "entitled to the same presumption of good faith where there is direct evidence that it has placed substantial reliance on factors whose consideration is forbidden by Title VII"; (2) the different evidentiary standard is appropriate once the plaintiff "proved discriminatory input into the

10

decisional process"; and (3) "a rule shifting the burden to the defendant where the plaintiff has shown that an illegitimate criterion was a 'substantial factor' in the employment decision will not conflict with other congressional policies embodied in Title VII." 490 U.S. at 270–74. These cases all demonstrate that the trigger for *Price Waterhouse* applicability is the existence of "direct evidence," and not whether the plaintiff concedes defendant's legitimate motivations.

The pertinent question is therefore whether plaintiff has produced "direct evidence" of discrimination. The New Jersey Supreme Court has held that "direct evidence" should be assessed in a totality of the circumstances analysis by asking "whether a statement made by a decisionmaker associated with the decisionmaking process actually bore on the employment decision at issue and communicated proscribed animus." *McDevitt*, 175 N.J. at 528 (citing *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002); *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)). Here, plaintiff has demonstrated direct evidence of a discriminatory motive. Plaintiff testified at her deposition that she was told that the store could not hire her because she was African-American and that she should apply to a different Payless "closer to the projects." Hardly any more direct evidence of a discriminatory intent is imaginable.

The Court is cognizant that plaintiff cannot rest on the "mere allegations or denials of [her] pleading." *Anderson*, 447 U.S. at 248 (citations and quotation marks omitted). But by taking her allegations and all the known facts, and drawing all reasonable inferences in plaintiff's favor, *see Matsushita*, 475 U.S. at 587, the Court must conclude that the record provides at least some support for her allegation. The record demonstrates that Payless has an expansive and robust system for avoiding discrimination in hiring, and it further shows that since 2006, the 8th Street Payless in Passaic has employed at least ten African-Americans. Nevertheless, the Court cannot ignore that Lindsay was responsible for hiring decisions at this particular store and that

she did not hire any African-Americans during her tenure as the store's manager.  Payless places great emphasis on the fact that she personally requested Donaldson work at the store on shared labor.  But Donaldson only worked two days as a temporary substitute.  This fact does not make implausible plaintiff's claim that Lindsay was reluctant to hire African-Americans because the store lacked an African-American clientele.  Consequently, the Court will not summarily reject plaintiff's deposition testimony as self-serving or her sworn testimony about what Lindsay told her as a mere general allegation.  It constitutes direct evidence of a discriminatory motive, and the Court will therefore apply the *Price Waterhouse* framework.

"Under *Price Waterhouse*, when a plaintiff produces evidence that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action, the burden of persuasion shifts to the employer to prove that even if it had not considered the proscribed factor, the employment action would have occurred." *McDevitt*, 175 N.J. at 527 (citing *Price Waterhouse*, 480 U.S. at 244–45).  Payless argues that the actual reason for its decision is that plaintiff was unqualified for the job.  The record establishes that at the time plaintiff applied to Payless in late 2009, she had limited work experience.  The Court cannot find from this record, however, that she was unqualified as a matter of law.  Plaintiff applied to Payless for a position as a sales associate.  The requirements for that position were that she "be able to service Customers' needs and use sales techniques"; "be able to enter data into a register to accomplish various transactions"; "accurately [record] transactions and mak[e] change"; "be able to read small print to verify price, style and size on items"; "process paperwork associated with all forms of POS transactions"; "be able to package Customer purchases, unassisted, in bags provided for this purpose"; "be able to move feely throughout the Store to observe Customers, provide service, and detect theft or other security

risks"; "have the dexterity and physical ability to receive and move cases of merchandise weighing up to 40 pounds"; "have the ability to follow a colorized rack plan"; "have the manual dexterity to change prices and tag merchandise as directed"; "be capable of changing Store displays and signs"; "have the scheduling flexibility and experience to open or close the Store as required"; and "have the ability to complete routine, daily housekeeping tasks." (Aversa Cert., Ex. N.)  The record indicates that Payless is open to hiring applicants as young as 17 years old, may hire part-time associates who are still in high school, and desires but does not require "[p]revious retail experience." (*Id.*)  If Payless is willing to hire high school students with no retail experience for this position, it follows that a reasonable jury could find plaintiff qualified for the job.  Accordingly, a reasonable jury could find that Payless would not have rejected plaintiff but for Lindsay's discriminatory animus.

   Payless asserts that, as Lindsay testified, the actual reason for plaintiff's rejection was her negative attitude at her interview.  For purposes of this summary judgment motion, however, the Court for two reasons cannot accept this as true.  First, plaintiff and Lindsay disagree as to whether plaintiff made the offending statements, thus creating a genuine issue of material fact that must be viewed in the light most favorable to plaintiff. (*Compare* Pl. Dep. 65:3–18 (testifying that she told Lindsay that she left Kmart due to budget cuts, that she did not discuss whether she got along with co-workers, and that "[t]hat was pretty much it" as to discussion of her work experience), *with* Lindsay Dep. 51:8–14 (testifying that at interview, plaintiff "was very negative in her conversations" and "always she feel like at the job nobody like her").)  Second, the absence of any supporting evidence that a negative attitude was the specific reason for the decision means that a reasonable jury could find plaintiff's recollection of the conversation plausible.  Therefore, Payless has failed to carry its burden of showing that it would

have taken the same action even absent the discrimination, and summary judgment as a matter of law cannot be granted.[2]

    B. Intentional Infliction of Emotional Distress

Payless argues that plaintiff's LAD claim preempts her claim for intentional infliction of emotional distress. (Def.'s Br. Supp. Mot. Summ. J. 15–16.) Although the New Jersey Supreme Court has not spoken on the issue, numerous courts have held that a plaintiff's common law claim is preempted when the conduct underlying that claim is the same conduct at issue in the plaintiff's LAD claim. *See Valentine v. Bank of Am.*, No. 09-262, 2010 U.S. Dist. LEXIS 8546, at *16 (D.N.J. Feb. 1, 2010) (Salas, J.) (holding that because plaintiff's common law intentional infliction of emotional distress claim "is based on the same facts as her claims under the LAD," "her LAD claims preempt her common law claim"); *Quarles v. Lowe's Home Ctrs., Inc.*, No.04-5746, 2006 U.S. Dist. LEXIS 97336, at *11 (D.N.J. Mar. 31, 2006) (Brown, J.) (dismissing common law intentional infliction of emotional distress claim because it "is based on the same allegations supporting Plaintiff's LAD claim"); *Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 492 (App. Div. 1994) (dismissing common law wrongful discharge claim, explaining that "supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists" because the "Legislature has declared the remedies available under the LAD and would appear to have expressed the view that a common law claim for

---

[2] Payless's arguments are largely rooted in the assumption that *McDonnell Douglas* is the applicable standard. The Court notes that summary judgment would be denied even under that framework. If *McDonnell Douglas* applied, the primary question at issue in this case would still be whether plaintiff was qualified and whether Lindsay rejected her for discriminatory reasons; the only difference in determining the outcome would be that Payless would carry the burden rather than plaintiff. *See generally Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 447–49 (2005). The record and the inferences drawn therefrom would permit a reasonable jury to find that plaintiff carried her burden, and burden-shifting therefore makes no difference in the outcome.

discrimination is unnecessary as the statute should be read broadly enough to encompass those claims and damages previously available at common law"); *see also* N.J.S.A. 10:5-3 (setting forth findings regarding harm that comes from discrimination and noting that "[s]uch harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages," and that the intent of the LAD is for "such damages [to] be available to all persons protected by this act").

Plaintiff appears to agree that her LAD claim subsumes her intentional infliction of emotional distress claim, as her opposition brief provides no response to Payless's argument. Accordingly, summary judgment is granted as to plaintiff's claim of intentional infliction of emotional distress.

C. Punitive Damages

Payless argues that plaintiff's claim for punitive damages should fail because the record lacks evidence of egregious conduct. (Def.'s Br. Supp. Mot. Summ. J. 17–18.)

In employment discrimination cases, the New Jersey Supreme Court has "identified two essential prerequisites. Those requirements are that there be proof that there was 'actual participation by upper management or willful indifference,' and proof that the conduct was 'especially egregious.'" *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 274 (2010) (quoting *Rendine v. Pantzer*, 141 N.J. 292, 313–14 (1995)). Payless does not argue that Lindsay was not part of "upper management." The Court nevertheless notes that in *Cavouti v. New Jersey Transit Corp.*, 161 N.J. 107, 129 (1999), the New Jersey Supreme Court held that even a person on the "second tier of management" is considered part of upper management if she has "broad supervisory powers over the involved employees, including the power to hire, fire, promote, and

discipline." Lindsay had hiring power for the store to which plaintiff applied, and she therefore qualifies as "upper management" for purposes of the punitive damages analysis.

The remaining question is whether the conduct was "especially egregious." The egregiousness requirement is "satisfied if plaintiff has proven 'an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard for the rights of [plaintiff],'" or if evidence "demonstrates that defendant acted with 'actual malice.'" *Quinlan*, 204 N.J. at 274 (quoting *Rendine*, 141 N.J. at 314; *Herman v. Sunshine Chem. Specialties, Inc.*, 133 N.J. 329, 329 (1993)). The concept "does not lend itself to neat or precise definitions," but factors to consider include "the likelihood that the conduct would cause serious harm, the actor's awareness or reckless disregard of the likelihood of such harm, the actor's behavior after he or she learned that the conduct would be likely to cause harm, the duration of the wrongful conduct and the acts, if any, undertaken to conceal the wrongful conduct." *Id.* (citing New Jersey Model Civil Instruction § 8.61 (Punitive Damages—LAD Claims)). Here, the evidence is sparse but sufficient to sustain the claim for punitive damages beyond the summary judgment stage. Lindsay's actions do not appear to have been "evil-minded" or motivated by "actual malice," but if a jury accepts plaintiff's testimony, it could reasonably find that Lindsay engaged in "wanton and willful disregard" of plaintiff's rights.

V. Conclusion

For the foregoing reasons, Payless's motion for summary judgment is granted as to plaintiff's claim for intentional infliction of emotional distress, denied as to plaintiff's claim under LAD, and denied as to plaintiff's eligibility for punitive damages.

/s/ Katharine S. Hayden
January 5, 2012                                    Katharine S. Hayden, U.S.D.J.